**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| DESTINY MONET ADAMS, duly appointed administrator of the estate of DAYVION DEVONTA BLAKE, deceased, and the mother and natural guardian of DY-NASTI BLAKE, who is the minor child of DAYVION DEVONTA BLAKE, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION: |
| v. | ) ) | |
| FULTON COUNTY SHERIFF PATRICK LABAT, in his official capacity, and DETENTION OFFICER EZEKIAL ISSAC in his official and individual capacities, and DETENTION OFFICER TARANCE COOPER in his official and individual capacities, and DETENTION OFFICER BRYAN PRICE in his official and individual capacities, and DETENTION OFFICER PAIGE DERRICK in her official and individual capacities, and DETENTION OFFICER ALDEN WATERS in his official and individual capacities, and DETENTION OFFICER JONATHAN PARKER in his official and individual capacities, and DETENTION OFFICER KENIO MIKE, JR., in his official and individual capacities, and DETENTION OFFICER MORRIS DEJUAN in his official and individual capacities, and DETENTION OFFICER LORNA HEATH in his official and individual capacities, and DETENTION OFFICER NASHEIM JOHNSON in his official and individual capacities, and DETENTION OFFICER JOSEPH MEMMELAAR in his official and individual | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |

capacities,                                          )
                                                     )
Defendants.                                          )

## COMPLAINT

COMES NOW, Destiny Monet Adams, the duly appointed Administrator of

the Estate of Dayvion Devonta Blake (hereinafter "Dayvion Blake" or "Plaintiff"),

the mother and natural guardian of Dy-Nasti Blake, who is Dayvion Blake's minor

child, and makes and files this Complaint against Defendants for violating the laws

of the United States and the State of Georgia, thereby proximately causing the

excruciating pre-death pain and suffering, and the wrongful death of Dayvion Blake,

on August 31, 2023, at the Fulton County, Georgia Jail in Atlanta, Georgia.

## PARTIES AND JURISDICTION

1.

Destiny Monet Adams is the duly appointed administrator of the estate of

Dayvion Devonta Blake, and the mother and natural guardian of Dy-Nasti Blake,

who is Dayvion Blake's minor child.

2.

Destiny Monet Adams resides in the State of Georgia and is subject to the

jurisdiction of this court.

2

3.

Defendant Sheriff Patrick Labat is a citizen of Georgia and resides within the Northern District of Georgia. Defendant Labat may be served with process at 185 Central Avenue SW, 9th Floor, Atlanta, Georgia 30303. Defendant Labat is subject to the jurisdiction of this Court and venue is proper.

4.

At all times relevant to this action, Defendant Patrick Labat was the duly elected Sheriff of Fulton County, Georgia ("Defendant Labat"). Defendant Labat was responsible for the day-to-day operations of the Fulton County Sheriff's Office, including the Fulton County Jail. Defendant Labat was responsible for ensuring and maintaining the physical safety and welfare of detainees at the Fulton County Jail. In his capacity as Sheriff, Defendant Labat had custody, control, and was in charge of the Jail, Jail staff, and the detainees/inmates populating the Jail.

5.

At all times relevant to this action, Defendant Labat acted under the color of state law. Defendant Labat is being sued for damages in his individual capacity.

6.

Defendant Ezekial Isaac is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

7.

Defendant Tarance Cooper is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

8.

Defendant Bryan Price is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

9.

Defendant Paige Derrick is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

10.

Defendant Alden Waters is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

11.

Defendant Jonathan Parker is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

12.

Defendant Kenio Mike, Jr. is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

13.

Defendant Morris Dejuan is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

14.

Defendant Lorna Heath is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

15.

Defendant Nasheim Johnson is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street, SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

16.

Defendant Joseph Memmelaar is a detention officer at the Fulton County Jail, may be served at the Office of the Fulton County Attorney, 141 Pryor Street,

SW, Suite 4038, Atlanta, Georgia 30303, and is subject to the jurisdiction of this court.

17.

Plaintiff plans to uncover further defendants whose deliberate indifference played a role in the tragic death of Mr. Blake. This may include, among others, deputies or jailers accountable for the absence of supervision when Mr. Blake and the inmates who caused his death were left unattended.

18.

The Defendants who were detention officers in Fulton County Jail, will be herein collectively referred to as "Detention Officer Defendants."

19.

At all times relevant herein, the defendants acted under color and authority of state law for purposes of the federal constitutional claims against them.

20.

Defendants above have waived any defense of qualified immunity by their actions described herein.

## FACTUAL ALLEGATIONS

21.

Fulton County Jail consists of a three-story low-rise structure joined to an elevator tower, providing access to two housing towers. The North Tower has

seven floors for housing, and the South Tower has Six. Each housing unit has eight zones arranged in a horseshoe around an elevated control tower. The housing zones have between 16 and 18 cells, split over two tiers. The cells open into a dayroom with tables bolted to the floor, phones, a kiosk (for ordering commissary and submitting grievances, among other things), and a shower on each tier.

22.

Makeshift knives or shanks made by detainees are a well-known and well-documented problem at the Fulton County Jail, resulting in violent attacks, severe injuries, and deaths.

23.

Fulton County Jail detainees are at constant risk of danger, serious personal injury, and death due to Fulton County Jail's crumbling infrastructure, which inmates use to craft makeshift knives, called "shanks," for use as weapons.

24.

The Fulton County Sheriff's Office Jail Operations Standard Operating Procedures describes the system that will be used to conduct patrols, and daily, weekly, and monthly inspections at the Fulton County Jail. The Operations Procedures for Safety and Facility Inspections, effective date June 13, 2023, is attached herewith as Exhibit A.

25.

The Fulton County Sheriff's Office Jail Operations Standard Operating Procedures effective date June 13, 2023, covers inspections to discover hand-made knives and shanks.

26.

According to the Operations Procedures for Safety and Facility Inspections at Fulton County Jail, "Inspections are to be made daily and monthly, including holidays and weekends, of all areas occupied by inmates. Shifts and housing supervisory staff will conduct a daily patrol, including holidays and weekends, of all areas occupied by inmates . . . Shift and housing supervisors will inspect all areas of the facility occupied by inmates in their areas of jurisdiction, checking for security, safety, and sanitation." Exhibit A, pg. 2, section A. Inspections.

27.

According to the Operations Procedures for Safety and Facility Inspections at Fulton County Jail, "Sergeants will conduct <u>daily</u> safety and sanitation inspections utilizing the Sergeants Daily Safety Inspection Report form." Exhibit A, pg. 2, section B. Supervisor (Daily Inspections).

28.

The Operations Procedures for Safety and Facility Inspections at Fulton County Jail goes on to state: "Listed below are safety checks and documenting procedures that are to be followed for housing inspections:

8

a. Inspect locks to ensure functionality and timeliness of repairs.

b. Inspect doors (leading to housing zones, sally ports, recreation zone and doors leasing [sic] to the outside) . . . " Id.

29.

Defendant Labat has explained to the Fulton County Board of Commissions Commissioners and to the general public on multiple occasions (including in 2021, 2022, and 2023) why there is such a proliferation of homemade knives and shanks at the Fulton County Jail. Detainees are crafting shanks from the crumbling infrastructure.

30.

On or about April 20, 2022, a sweep of the Fulton County Jail resulted in the discovery of nearly one hundred knives or shanks.

31.

According to the Fulton County Sheriff's Office, from January 2021 to December 2022, deaths at the Fulton County Jail quadrupled.

32.

In a dramatic and well-publicized appearance before the Atlanta City Council on October 3, 2022, Defendant Labat had a Jail guard roll a wheelbarrow full of knives/shanks confiscated from the Fulton County Jail into the Atlanta City Council Chambers.

33.

Less than one year later, in March 2023, a search of only one third of the housing zones in the Jail uncovered more than two hundred homemade knives/shanks.

34.

By the time of the mid-march 2023 search, there had been seventy eight stabbings at the jail in 2023, more than one per day.

35.

In 2023, the Sheriff's General Counsel, Amelia Joyner, told a panel of Georgia State Legislators investigating the jail that overcrowding strains the physical limits of the aging jail and contributes to the violence.

36.

The Jail's reputation as one of the most dangerous jails in the country has become so infamous that it prompted the United States Department of Justice ("DOJ") to launch an investigation on July 13, 2023, into both the Fulton County Jail and Fulton County.

37.

Summarizing the reasons for the DOJ investigation, Attorney General Merrick B. Garland stated, "We launched this investigation into the Fulton County Jail based on serious allegations of unsafe, unsanitary living conditions at the jail,

excessive force and violence within the jail, discrimination against incarcerated individuals with mental health issues, and failure to provide adequate medical care to incarcerated individuals."

38.

The Department of Justice investigation was premised in part on the Civil Rights of Institutionalized Persons Act — a federal law that authorizes the Department of Justice to investigate state institutions, including county jails, to determine whether incarcerated people are subjected to a pattern or practice of constitutional violations.

39.

According to Assistant Attorney General Kristin Clarke, the DOJ's investigation of the Fulton County Jail revealed that at one point in 2022, more than two hundred weapons were discovered during a sweep of the main jail.

40.

DOJ investigators reported credible allegations that inmates of the jail are housed in a facility considered "structurally unsafe," that correctional officers are using excessive force, and that violence is widespread, resulting in serious injuries and murders.

41.

Ryan Buchanan, United States Attorney for the Northern District of Georgia, joined Attorney General Garland, providing his view of the justification for the DOJ investigation, stating, "The recent allegations of filthy housing teeming with insects, rampant violence resulting in death and injuries, and officers using excessive force are cause for grave concern and warrant a thorough investigation."

42.

Condemning the Fulton County Jail, in particular, Assistant Attorney General Kristen Clarke said, "The unconstitutional conditions that we see too often inside jails and prisons have no place in society today."

43.

Defendant Labat has publicly admitted that he lacks the resources to carry out his legally mandated responsibility to protect the constitutional rights of detainees at the Fulton County Jail.

44.

On July 21, 2023, representatives of the National Institute of Corrections (NIC), the U.S. Department of Justice, and the Bureau of Judicial Assistance (BJA) conducted a site visit to the Fulton County Jail. Among other actions, these representatives met with Defendant Labat.

45.

Defendant Labat advised the members of the site visit team that the number of uniformed staff vacancies in the Jail was at a critical staffing shortage level.

46.

According to Defendant Labat, a housing floor at the Jail should ideally have two officers in the housing control room, as well as three officers who constantly move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

47.

According to Defendant Labat, in practice, there is typically only one officer in the housing control room and, at most, one officer moving through the housing zones with nearly two hundred (200) detainees.

48.

Defendant Labat informed the NIC, DOJ, and BJA representatives that during his term thousands of homemade knives made of materials from the deteriorating facility had been confiscated at the Jail.

49.

Defendant Labat also informed the NIC, DOJ, and BJA representatives that detainees often fashion weapons when they do not feel safe.

50.

In a mid-July 2024 news conference, Defendant Labat stated that since June 1, 2024, there had been ten stabbings at the Jail and that seventy-five (75) knives/shanks had been confiscated.

51.

On November 14, 2024, the Department of Justice released a 105-page report, titled Investigation of the Fulton County Jail, describing its extensive investigation into Fulton County Jail, and results, determinations, and recommendations for change. The Department of Justice report is attached herewith as Exhibit B.

52.

From its investigation, the Department of Justice found reasonable cause to believe that Fulton County and the Fulton County Sheriff's Office violate the constitutional and statutory rights of people incarcerated in the Fulton County Jail. Exhibit B, p. v.

53.

The Department of Justice determined that Fulton County Jail fails to adequately protect incarcerated people from the substantial risk of serious harm from violence, including from homicides and stabbings by other detainees, and due to its failure to use correctional practices such as classification, housing plans, assessment of the likelihood of victimization, and consideration of gang affiliations, to manage

the incarcerated population and reduce the risk of violence. Exhibit B, p. v. – vi; p. 17 sec. 2.

54.

The Department of Justice determined that restrictive housing conditions in the Jail pose a substantial risk of harm, including acute mental illness and self-injury, and restrictive housing practices are discriminatory and unlawful. Exhibit B, p. vi.

55.

The Department of Justice determined that Fulton County Jail staff are rarely present in the housing units and do not perform adequate security rounds or otherwise monitor people to prevent harm. As a result, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents. Exhibit B, pg. 19.

56.

The Department of Justice determined that malfunctioning doors are a major security failure and a serious risk to the safety of incarcerated people, and the jail could provide secure cell doors and keep door locks in good repair, but fails to do so merely by inattention. Exhibit B, p. 25 – 26.

57.

The Department of Justice found that leadership at Fulton County and the Sheriff's Office are aware of the violence in the Jail and have publicly decried it. Yet they have failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts continue at dangerous levels. Exhibit B, p. 8. sec. 1.

## DAYVION BLAKE

58.

At the time of his death, Dayvion Blake was a pre-trial detainee at Fulton County Jail.

59.

Dayvion Blake was murdered in an attack by rival detainees in Fulton County Jail on August 31, 2023.

60.

The Incident Report memorializing the August 31, 2023, attack and murder of Dayvion Blake is attached herewith as Exhibit C.

61.

The fatal attack on Dayvion Blake occurred in Zone 400 on the 7th Floor of the South Tower. Exhibit C, pg. 1 – 2.

62.

Prior to the fatal attack on Dayvion Blake, he had been involved in several incidents, which were complicated by his difficulty remembering events and responding to commands from detention officers.

63.

Prior to Dayvion Blake's murder, he was attacked by inmates using shanks on at least three separate occasions, was tasered by detention officers on at least three separate occasions, and was placed on suicide watch.

64.

On February 6, 2023, Dayvion Blake was housed in Zone 500 on the 4th floor of the South Tower.

65.

A February 6, 2023, Incident Report is attached herewith as Exhibit D.

66.

On February 6, 2023, a detainee in Zone 500 on the 4th floor of the South Tower got in a fight with Dayvion Blake, which culminated into the detainee stabbing Dayvion Blake in the back multiple times with a shank.  Exhibit D, pg. 1 – 2.

67.

After the February 6, 2023, fight, both Dayvion Blake and the detainee wielding a shank were seen and "medically cleared" to return to the 4th floor of the South Tower. Id., pg. 1.

68.

Detention Sergeant J. Tidwell investigated the February 6, 2023, fight and recommended Dayvion Blake and the other detainee be moved to lockdown. Detention Lieutenant Melissa Wells reviewed and approved Detention Sergeant J. Tidwell's recommendations.

69.

On February 10, 2023, at 11:29am Detention Officer L. Rollins was assigned as the "floor" [sic] on the 4th Floor of the North Tower. Detention Officer L. Rollins report states that "Due to not having a tower officer, at approximately 11:29 [am] I was conducting security rounds from the horseshoe."

70.

A February 10, 2023, 11:29am Incident Report is attached herewith as Exhibit E.

71.

On February 10, 2023, at 11:29am detainee Donterrious Whitaker complained to Detention Officer L. Rollins that he was being threatened and extorted by five detainees, including Dayvion Blake. Exhibit E, p. 1.

18

72.

Detention Officer L. Rollins recommended detainee Donterrious Whitaker be relocated per classification department for his safety. Detention Lieutenant M. Wells reviewed DO L. Rollins Report, and approved the recommendations.

73.

On February 10, 2023, at 4:25pm Dayvion Blake was involved in a large fight in Zone 200 on the 4th Floor of the North Tower.

74.

A February 10, 2023, 4:25pm incident report is attached herewith as Exhibit F.

75.

Deputy Sheriff Sergeant R. Williams investigated the February 10, 2023, 4:25pm incident, and determined that Dayvion Blake had instigated the fight, was acting erratically, and based on her training with the Crisis Intervention Team, which allows her to identify those with diminished mental capacity, Dayvion Blake should be housed in the Mental Health Unit on the 3rd Floor of the North Tower. Detention Lieutenant Melissa Wells reviewed the investigation and approved Deputy Sheriff Sergeant R. Williams recommendations. Exhibit F, p. 2.

76.

On March 1, 2023, Dayvion Blake was in Zone 300 on the 5th Floor of the South Tower.

77.

A March 1, 2023, Incident Report is attached herewith as Exhibit G.

78.

On March 1, 2023, Detention Officer L. Sweeney was assigned to the 5th Floor of the South Tower as the Floor Officer for the 7am – 7pm shift.

79.

At approximately 7:38am on March 1, 2023, Detention Officer Lashawn Sweeney observed Dayvion Blake standing in the Zone 300 red zone [a red box outlined on the floor in front of the zone door] on the 5th Floor of the South Tower with all his belongings, stating he can't be in the zone, and he feared for his life. She interviewed Dayvion Blake, who stated, "I don't owe any commissary to anyone!" and for the safety of himself and others he would like to be moved because he felt he might harm someone. Detention Officer Lashawn Sweeney contacted Mental Health on behalf of Dayvion Blake.

80.

On April 29, 2023, at or about 7:50pm Dayvion Blake was stabbed while in Zone 300 on the 5th Floor of the North Tower.

81.

An April 29, 2023 incident report is attached herewith as Exhibit H.

82.

Lieutenant Sergeant Shannon Roberson reviewed security camera footage of the incident, and saw several inmates walking in and out of cell number 306. Dayvion Blake then exits cell 306, walks around in zone 300, and argues with several unidentified (possibly 2-3) inmates in the zone. Exhibit H, pg. 2.

83.

No one could identify the other inmates involved in the April 30, 2023, attack in Zone 300 on the 5th Floor of the North Tower because the video quality was too poor (blurry) to adequately identify them. Id.

84.

Dayvion Blake was taken to medical and Lieutenant Sergeant Shannon Roberson recommended Dayvion Blake be relocated for his safety.

85.

On May 1, 2023, at or about 2:53pm Dayvion Blake was in Zone 300 on the 1st Floor of the North Tower.

86.

A May 1, 2023, 2:53pm incident report is attached herewith as Exhibit I.

87.

On May 1, 2023, at or about 2:53pm, Detention Officer Modu Janneh observed Mr. Blake had gathered his belongings, and upon interviewing Dayvion Blake, Mr. Blake stated he would like to be moved because he felt like he may harm someone. Mental Health was contact on behalf of Dayvion Blake. Exhibit I, p. 1.

88.

Supervisor Deputy Sheriff Gaston reviewed Detention Officer Janneh's incident report and recommended Mr. Blake be moved for his safety.

89.

Later on May 1, 2023, at or about 8:49pm, Dayvion Blake was involved in another incident in Zone 200 on the 2nd Floor of the North Tower.

90.

A May 1, 2023, 8:49pm incident report is attached herewith as Exhibit J.

91.

Detention Officer Whatley, Detention Officer Hester, and Detention Officer Johnson responded to detainee Rushin banging on the walls of cell 204 calling for help. Detainee Rushin was alarmed about Dayvion Blake's unreported placement in the new cell, and complained Dayvion Blake was antagonizing him. Ex. J. p. 2.

92.

During the subsequent questioning, Detention Officer Hester told Dayvion Blake to go back into cell 204, but Dayvion Blake attempted to walk out of Zone 200. Detention Officer Hester and Detention Officer Johnson ordered Dayvion Blake to return to cell 204, but he did not comply, and was tased by Officer Johnson. Id. p. 1.

93.

Detention Officer Obasi asked Dayvion Blake why he did not comply with Detention Officer Hester's instructions to go into cell 204 and return to Zone 200, Mr. Blake said he could not remember. Id. p. 1 – 2.

94.

Detention Officer Obasi recommended Dayvion Blake be moved to lockdown for 42 days in accordance with the Fulton County Sheriff's Handbook. He also recommended Dayvion Blake and Detainee Rushin be separated from the same zone.

95.

On June 17, 2023, Dayvion Blake was in Zone 300 on the 6th Floor of the South Tower.

96.

A June 17, 2023, incident report is attached herewith as Exhibit K.

97.

On June 17, 2023, Dayvion Blake asked Detention Officer D. Gibbs if he could act as an Orderly, by helping distribute food trays to detainees as part of the feeding service. Detention Officer D. Gibbs said no, and Dayvion Blake attempted to grab a tray. Detention Officer D. Gibbs then tased Dayvion Blake. Exhibit K, pg. 1 – 2.

98.

Dayvion Blake was taken to medical, where Naphcare staff approved Dayvion Blake to return to the 6th Floor of the South Tower.

99.

During the subsequent investigation, Sergeant Johnson learned that most inmates in zone 300 became angry with Dayvion Blake for his behavior, that Dayvion Blake was acting odd, and recommended that Dayvion Blake should have a mental health referral.

100.

On July 2, 2023, Dayvion Blake was in Zone 200 on the 2nd Floor of the North Tower.

101.

A July 2, 2023 incident report is attached herewith as Exhibit L.

102.

On July 2, 2023, at or about 8:30am Dayvion Blake showed his penis and masturbated in front of Detention Officer Nykia Paul and Detention Officer Johnson. They ordered Dayvion Blake to stop, and when he did not, they entered Zone 200, removed Dayvion Blake, handcuffed him, and took him to Zone 700.

103.

Sergeant Bryan Price investigated the incident, determined that the behavior would not be tolerated, recommended 14 days placement in lockdown pending disciplinary hearing, and submitted the report to jail management. Exhibit L, p. 1 – 2.

104.

Dayvion Blake was again witnessed masturbating later that day by Detention Officer D. Hobbs on the 4th Floor of the South Tower. Detention Officer D. Hobbs pepper sprayed Dayvion Blake, escorted him to medical, then notified the watch commander for further investigation. Exhibit L, p. 3.

105.

On July 5, 2023, Dayvion Blake, while in Zone 100 on the 7th Floor of the North Tower, was attacked by inmates Myron Njie, Zykier Drakeford, and Quontavious Oliver. One of the inmates tried to throw Dayvion Blake off a balcony,

another inmate shanked Dayvion Blake around his waist, and the third inmate punched Dayvion Blake in the face.

106.

A July 5, 2023, incident report documenting the incident in the preceding paragraph is attached herewith as Exhibit M.

107.

Deputy Tevin Wilcox escorted Dayvion Blake to medical, but then medical returned Dayvion Blake to Deputy Wilcox. Deputy Wilcox then brought Dayvion Blake to a different jail zone, where Dayvion Blake showed his penis and masturbated in front of a nurse. Exhibit M, p. 1.

108.

Deputy Sheriff Sergeant R. Williams II reviewed security footage of the July 5, 2023, fight and observed inmates attempting to throw Dayvion Blake over a balcony railing, stabbing Dayvion Blake with a shank all around the torso, and punching Dayvion Blake in the face.   Id. p. 2.

109.

The July 5, 2023, attack on Dayvion Blake happened in a zone with sliding cell doors that inmates can open and close at will by manipulating the manual override mechanism that controls the cell doors in the zone. Exhibit M. p. 3.

110.

Detention Officer R. Williams incident report states, "It should be noted that this attack happened in a lockdown zone with sliding cell doors that the inmates can open and close at will . . . This is a VERY WELL DOCUMENTED ISSUE that has been going on for months, yet never rectified."

111.

On July 21, 2023, Dayvion Blake, while in Zone 600 of the 7th Floor of the North Tower, was assaulted by detainees Denzel Cardenas, Clifford Person, and Tyrone Robinson.

112.

A July 21, 2023, incident report is attached herewith as Exhibit M.

113.

The July 21, 2023, incident was investigated by Sergeant Bryan Price.

114.

During the July 21, 2023, incident the power was out on the 7th Floor of the North Tower, and the attack occurred inside a cell.

115.

In addition to the assault on Dayvion Blake, Inmate Denzel Cardenas was charged with starting a fire and interfering with security operations in Zone 600. Exhibit M, p. 1 – 2.

116.

On July 28, 2023, Dayvion Blake requested a mental health consultation.

117.

On July 29, 2023, Dayvion Blake was housed in cell 409, in Zone 400 on the 7th Floor of the South Tower.

118.

A July 29, 2023 incident report is attached herewith as Exhibit O.

119.

On July 29, 2023, at or about 6:30pm Detention Officer Kenio Mike, Jr. witnessed Dayvion Blake manually release several jail cell doors to let detainees out into the Zone's common area. Exhibit O, p. 1.

120.

Detention Officer Kenio Mike, Jr. ordered Dayvion Blake to go back into cell 409, and Dayvion Blake instead ran to Zone 700, where he attempted to take a bag of ice. Detention Officer Mike tased Dayvion Blake and escorted Dayvion Blake to medical. Id.

121.

Sergeant Bryan Price reviewed the July 29, 2023, investigation report and recommended 56 days of total lockdown pending disciplinary hearing. Id., p. 2.

122.

On August 3, 2023, Dayvion Blake was placed on suicide watch.

123.

Once placed on suicide watch, Dayvion Blake was not supposed to have any items in his room.

124.

On August 3, 2023, at or about 6:53pm, despite being on suicide watch, Dayvion Blake was in again in cell 409 in Zone 400 on the 7th Floor of the South Tower.

125.

An August 3, 2023, 6:53pm incident report is attached herewith as Exhibit P.

126.

At or about 8:00pm, Sergeant A. Waters heard knocking on the door of cell 409, was told the detainee in cell 409 was on suicide watch, looked inside cell 409, and saw Dayvion Blake with a six-inch shank in hand. Exhibit P, p. 1.

127.

Sergeant A. Waters asked the tower officer to open the door to cell 409.

128.

Sergeant A. Waters then entered the cell and found another shank hidden between Dayvion Blake's buttocks. Id.

129.

Sergeant A. Waters and Detention Officer Cooper tried to take the shanks from Dayvion Blake, and then tased Dayvion Blake. Dayvion Blake did not respond to multiple applications of the taser all over his body, or to pepper spray. Id., p. 1 – 2.

130.

Sergeant Waters eventually gained compliance, and took Dayvion Blake to medical, where Dayvion Blake masturbated while having the pepper spray washed off his face.

131.

Dayvion Blake was then assigned to the medical floor 3LD 20 for Mental Health Evaluation. Id. p. 5.

132.

A Naphcare medical report for August 3, 2023, is attached herewith as Exhibit Q.

133.

Naphcare medical reports for August 3, 2023, state that Dayvion Blake was selectively mute, but deputies did not report any dangerous behaviors and/or gestures to NaphCare's medical staff, simply reporting bizarre behavior with limited details, and suicidal ideation during segregation rounds. Exhibit Q, p. 1 – 4.

134.

On August 4, 2023, Dayvion Blake behaved in a threatening manner toward NaphCare medical staff, including forcibly banging on plexi-glass.

135.

On August 4, 2023, Dayvion Blake was diagnosed with schizophrenia and started taking Risperidone and undergoing Haloperidol Lactate Injections for schizophrenia.

136.

On August 5, 2023, Destiny Redmond prepared a NaphCare housing transfer form calling for Dayvion Blake to be moved to a housing location for suicide watch.

137.

On August 5, 2023, Dayvion Blake told a medical provider that he wanted to kill himself, would not explain why he wanted to kill himself, then unsuccessfully attempted to hang himself using his pants as a noose and tying the pants around loose wires in the ceiling.

138.

On August 6, 2023, Dayvion Blake was unwilling to speak with the NaphCare medical providers and hung a long cloth from the ceiling with apparent intent to hang himself.

139.

On August 8, 2023, Alyssa R. Brown, MHP, released Dayvion Blake to housing in general population.

140.

On August 9, 2023, John Smith, MD, a psychiatrist employed by Naphcare, discharged Dayvion Blake from treatment.

141.

Dayvion Blake continued taking Risperidone for schizophrenia but refused or no showed for scheduled medication dispersal on the evening of August 28, 2023, and the morning of August 31, 2023.

142.

Dayvion Blake was killed in an attack at 2:21pm on August 31, 2023. The attack occurred in Zone 400 on the 7th Floor of the South Tower. Exhibit C, throughout.

143.

On August 31, 2023, at the time of the attack that caused Davion Blake's death, Detention Officer Ezekial Isaak was assigned as the Tower Officer of the 7th Floor of the South Tower. Exhibit C, p. 1.

144.

On August 31, 2023, Detention Officer Tarance Cooper was assigned to 7 South as the Floor Officer. Id., p. 2.

145.

At the time of the attack on Dayvion Blake, Floor Officer Tarance Cooper was feeding in zone 200 of the 7th Floor of the South Tower. Id.

146.

At 2:21pm, Tower Officer Ezekial Isaak heard a loud banging on the zone 400 door and an unidentified inmate screaming for help. Detention Officer Ezekial Isaak saw blood on the zone 400 door, and an inmate lying on the floor in a pool of blood. Id. p. 1.

147.

Tower Officer Ezekial Isaak radioed for help to Floor Officer Tarance Cooper. Ezekial Isaak then escorted Orderlies to zone 200, and opened the 903 door, and waited for further instructions. Id.

148.

Floor Officer Tarance Cooper went to Zone 400 and saw Dayvion Blake lying on the floor covered in blood. Floor Officer Terence Cooper then radioed for help to Detention Officer Bryan Price, who was the assigned supervisor to the 7th Floor of the North Tower, and to Watch Commander Derrick Paige. Id. p 2 – 3.

149.

Detention Officer Bryan Price's Incident Report states that he was notified by Floor Officer Cooper to investigate the incident in 7 South cell 409. Id. p. 2.

150.

Watch Commander Derrick Paige's Incident Report states that he "overheard" Floor Officer Terence Cooper come over the radio stating that he needed a stretcher due to a stabbing on 7 South Zone 400. Id. p. 3.

151.

At approximately 2:29pm, multiple officers arrived through the 903 door on the 7th Floor of the South Tower.

152.

Dayvion Blake was taken to Grady Hospital and pronounced dead.

153.

At the time of the attack on Dayvion Blake in Zone 400 of the 7th Floor of the South Tower, there were only two detention officers present on the 7th Floor of the South Tower: Ezekiel Elliot, acting as tower officer, and Tarance Cooper, acting as Floor Officer. Exhibit C, p. 1 – 2.

154.

In Zone 400 on the 7th Floor of the South Tower, there was a documented history of cells doors being opened without authorization and shanks constructed out of crumbling jail materials. Exhibit N, O.

155.

The attack on Dayvion Blake was possible due to detainees' ability to interfere with security operations by opening cell doors in Zone 400 on the 7th Floor of the South Tower.

156.

Before Dayvion Blake's murder in Zone 400 on the 7th Floor of the South Tower, he had been housed in that same Zone on August 3, 2023, was found in possession of multiple shanks while on suicide watch, was not subdued after being repeatedly tased all over his body and pepper sprayed, and was moved to medical floor 3LD 20 for mental health evaluation. Ex. N.

157.

Before Dayvion Blake's murder in Zone 400 on the 7th Floor of the South Tower, Deputy Sheriff Sergeant R. William had recommended Dayvion Blake be housed in the Mental Health Unit on the Third Floor of the North Tower. Exhibit F, p. 2.

158.

After being released from medical floor 3LD 20, Dayvion Blake was returned to Zone 400 on the 7th Floor of the South Tower, where he was killed.

## COUNT I:

## 42 USC § 1983 DELIBERATE INDIFFERENCE TO A KNOWN RISK OF HARM AND SERIOUS MEDICAL NEEDS BY DEFENDANTS EZEKIAL ISAAC, TARANCE COOPER, BRYAN PRICE, PAIGE DERRICK, ALDEN WATERS, JONATHAN PARKER, MORRIS DEJUAN, LORNA HEATH, NASHEIM JOHNSON, JOSEPH MEMMELAAR, AND KENIO MIKE, JR. (DETENTION OFFICER DEFENDANTS)

159.

Dayvion Blake was entitled to the protection of his constitutional rights under the Fourteenth Amendment including protection from deliberate indifference to his safety and well-being.

160.

Defendants Ezekial Isaac, Tarance Cooper, Bryan Price, Paige Derrick, Alden Waters, Jonathan Parker, Morris DeJuan, Lorna Heath, Nasheim Johnson, Joseph Memmelaar, and Kenio Mike (the "Detention Officer Defendants") breached their duties as correctional officers to protect detainees from unnecessary violence and refrain from violating their constitutional rights under the Fourteenth Amendment.

161.

The wrongful conduct of Defendants as alleged herein was a direct and proximate cause of Mr. Blake's death.

162.

The lack of sufficient staffing of tower officers and floor officers on the 7th

Floor of the South Tower posed a substantial risk of serious harm to Dayvion Blake.

163.

After Dayvion Blake's release from medical floor 3LD 20, his return to Zone 400 on the 7th Floor of the South Tower posed a known, substantial risk of serious harm.

164.

Under the Eighth and Fourteenth Amendments, a jail must protect detainees from known risks of serious injury and death. Farmer v. Brennan, 511 U.S. 825, 837 – 39 (1994).

165.

A prison official's deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain. Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) *citing* Estelle v. Gamble, 429 U.S. 97, 104 (1976).

166.

Dayvion Blake had an objectively serious medical need, as demonstrated by his erratic and aggressive behavior, multiple mental health evaluations, placement on suicide watch, and assignment to medical floor 3LD 20 for mental health evaluation while on suicide watch.

167.

Fulton County Jail officials acted with deliberate indifference to Dayvion Blake's objectively serious medical need, by allowing him to be moved from medical floor 3LD 20, back into Zone 400 where he had released cell doors and was not subdued by detention officers after multiple repeated attempts at tasing and pepper spray.

168.

Fulton County Jail Officials failed to protect Dayvion Blake from known risks of serious injury and death by failing to move Dayvion Blake to a housing zone on a floor that had more than two detention officers.

169.

Fulton County Jail Officials failed to protect Dayvion Blake from known risks of serious injury and death by failing to move Dayvion Blake away from the 7th Floor of the North Tower, which had a known prevalence of shanks.

170.

Defendants knew their actions and inactions risked serious harm to Dayvion Blake, disregarded that risk and failed to take reasonable measures to protect Dayvion Blake.

171.

On July 29, 2023, in Zone 400 on the 7th Floor of the South Tower, Defendants

Kenio Mike, Jr., Bryan Price, and Paige Derrick knew that Dayvion Blake was housed in a zone that had doors that may be manually released by detainees.

172.

On August 3, 2023, in Zone 400 on the 7th Floor of the South Tower, Defendants Alden Waters, Tarance Cooper, Jonathan Parker, Dejuan Morris, Lorna Heath, Nasheim Johnson, and Joseph Memmelaar failed to subdue Dayvion Blake through multiple applications of a taser all over Dayvion Blake's body and by pepper spray, and knew that Dayvion Blake possessed shanks while on suicide watch.

173.

Defendants in the preceding paragraph did not report any dangerous behaviors by Dayvion Blake to NaphCare medical providers after the August 3, 2023, incident, only stating that he was being bizarre. Exhibit Q, p. 4.

174.

Despite the known risk of serious harm to Dayvion Blake, Defendants did not keep Dayvion Blake in protective custody, instead placing him back into Zone 400 of the 7th Floor of the South Tower, which has a known prevalence of shanks and cell doors that could be popped open.

175.

But for Defendants' actions of placing Dayvion Blake in a cell with locks that could be "popped" open by inmates, Dayvion Blake would not have been murdered

on August 31, 2023.

176.

But for Defendants' action of placing Dayvion Blake in a housing zone with a known prevalence of shanks, Dayvion Blake would not have been murdered on August 31, 2023.

177.

Despite the known risk of serious harm to Dayvion Blake, Defendants did not keep Dayvion Blake on Medical Floor 3LD 20, instead reinserting him into population in Zone 400 of the 7th Floor of the South Tower.

178.

Despite the known risk of serious harm to Dayvion Blake, Defendants did not request additional patrols or add new surveillance cameras to Zone 400 of the 7th Floor of the South Tower.

179.

Despite the known risk of serious harm to Dayvion Blake, Defendants did not place Dayvion Blake in a housing unit that was specialized to his unique mental health concerns.

180.

On August 31, 2023, there were only two detention officers present on the 7th Floor of the South Tower.

40

181.

On August 31, 2023, despite the known risk of serious harm to Dayvion Blake, Defendants Ezekiel Isaac and Tarance Cooper were not watching Zone 400 during the attack on Dayvion Blake.

182.

Despite Defendant Tarance Cooper's knowledge of a risk of harm to Dayvion Blake, he was conducting feeding in Zone 200, instead of monitoring zone 400, where the murder happened.

183.

Despite Defendant Ezekial Elliot seeing Dayvion Blake lying on the floor of zone 400 in a pool of blood, he did not return to zone 400 after opening the 903 door for more detention officers to enter.

184.

Despite Defendant Bryan Price's knowledge of past incidents and harm to Dayvion Blake, Bryan Price did not request additional detention officers to patrol the 7th Floor of the South Tower on the day Dayvion Blake was murdered.

185.

Defendants did not take available measure to abate the risk to Dayvion Blake.

186.

A reasonable correctional officer in the same circumstances would have

appreciated the high degree of risk to Dayvion Blake, making the consequence of serious harm and death to Dayvion Blake obvious.

187.

Accordingly, The Estate of Dayvion Blake and the children of Dayvion Blake are entitled to recover compensatory damages, punitive damages, and all other damages allowed under law from the detention officers.

## COUNT II

### SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT LABAT ARISING FROM THE FAILURE TO UNCOVER AND CONFISCATE SHANKS AND TO REMEDY CELL DOORS THAT DETAINEES CAN POP OPEN IN ZONE 400 WHERE DAYVION BLAKE WAS KILLED

188.

Defendant Sheriff Labat's supervisory failure, including his failure to adequately supervise the Defendant Officer Defendants, created a causal connection to the fatal attack on Dayvion Blake.

189.

Defendant Labat was well aware of the severe understaffing at Fulton County Jail.

190.

Defendant Labat was well aware of the pervasive presence of hand-made knives, or "shanks," which detainees craft using the crumbling jail infrastructure.

191.

Defendant Labat was well aware that detainees could pop open jail cell doors and housing zone doors without authorization.

192.

Defendant Labat was well aware of the history of widespread detainee-on-detainee abuse and violence at the Fulton County Jail.

193.

The Operations Procedures for Safety and Facility Inspections, effective date June 13, 2023, attached hereto as Exhibit A, requires daily inspections of all areas occupied by inmates, checking for security, safety, and sanitation. Exhibit A, pg. 2, section A. Inspections.

194.

The Operations Procedures for Safety and Facility Inspections at Fulton County Jail requires, "Sergeants will conduct <u>daily</u> safety and sanitation inspections utilizing the Sergeants Daily Safety Inspection Report form." <u>Id</u>., pg. 2, section B, Supervisor (Daily Inspections).

195.

The Operations Procedures for Safety and Facility Inspections at Fulton County Jail goes on to state: "Listed below are safety checks and documenting procedures that are to be followed for housing inspections . . . :

   c.  Inspect locks to ensure functionality and timeliness of repairs.

   d.  Inspect doors (leading to housing zones, sally ports, recreation zone and doors leasing [sic] to the outside) . . . " Id.

### 196.

Despite the existence of written policies and procedures which should have led to the discovery and confiscation of handmade shanks, the Detention Officer Defendants did not conform to the policies and procedures, and so failed to prevent the August 31, 2023, shanking attack on Dayvion Blake's and his death.

### 197.

Defendant Labat's deficiencies in supervision encompass the inadequate handling of the proliferation of weapons made from the crumbling infrastructure of the jail.

### 198.

Despite the existence of written policies and procedures which should have led to the discovery and remediation of cell doors that detainees could pop open without authorization, the Detention Officer Defendants did not conform to the policies and procedures, and so failed to prevent the August 31, 2023, shanking attack on Dayvion Blake's and his death.

199.

In a previous incident report documenting a July 5, 2023, shanking attack on Dayvion Blake, Detention Officer R. Williams stated, "It should be noted that this attack happened in a lockdown zone with sliding cell doors that the inmates can open and close at will . . . This is a VERY WELL DOCUMENTED ISSUE that has been going on for months, yet never rectified." Exhibit M, p. 3.

200.

The Department of Justice determined that malfunctioning doors are a major security failure and a serious risk to the safety of incarcerated people, and the jail could provide secure cell doors and keep door locks in good repair but fails to do so merely by inattention. Exhibit B, p. 25 – 26.

201.

Defendant Labat's deficiencies in supervision encompass the inadequate security of cell doors and inadequate monitoring and enforcement of maintenance requests to remedy cell doors that detainees can pop open.

202.

Defendant Labat's failures to act constitute deliberate indifference to Dayvion Blake's safety and well-being, resulting in serious harm – Dayvion Blake's death.

203.

By not providing for the discovery and confiscation of shanks, and failing to

provide secure cell doors and keep door locks in good repair, Defendant Labat personally participated in the violation of Dayvion Blake's constitutional rights.

204.

Accordingly, The Estate of Dayvion Blake and the children of Dayvion Blake are entitled to recover compensatory damages, punitive damages, and all other damages allowed under law from Defendant Labat.

**COUNT III:**
**SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT LABAT ARISING FROM DETENTION OFFICERS EZEKIAL ISAAC AND TARANCE COOPER'S FAILURE TO PERFORM VISUAL WELL-BEING CHECKS AND SECURITY ROUNDS DURING THE HOUR OF DAYVION BLAKE'S DEATH**

205.

Defendant Labat was well area that as a result of the severe understaffing, Fulton County Jail posed an extreme risk of severe harm and death to detainees.

206.

The serious understaffing of the jail was a known contributor to detainee-on-detainee abuse and violence but were left largely unaddressed by Defendant Labat.

207.

Defendant Labat was aware that as a result of severe understaffing, a regular part of Defendant Tarance Cooper's job, feeding detainees in one of the six zones on the 7th floor of the South Tower, would require Defendant Tarance Cooper to leave the other five zones unattended for a significant period of time. Upon

information and belief, this is a pattern of absence from Zone 400 of which the detainees in Zone 400 would have become aware over time.

208.

Defendant Labat's deficiencies in supervision encompass the inadequate handling of substantial overcrowding, critical understaffing, and the proliferation of weapons made from the crumbling infrastructure of the Jail.

209.

Defendant Labat was well aware of the critical staffing shortages at the Jail, including on August 31, 2023.

210.

On July 21, 2023, representatives of the National Institute of Corrections (NIC), the U.S. Department of Justice, and the Bureau of Judicial Assistance (BJA) conducted a site visit to the Fulton County Jail. Among other actions, these representatives met with Defendant Labat.

211.

Defendant Labat advised the members of the site visit team that the number of uniformed staff vacancies in the Jail was at a critical staffing shortage level.

212.

According to Defendant Labat, a housing floor at the Jail should ideally have two officers in the housing control room, as well as three officers who constantly

move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

### 213.

According to Defendant Labat, in practice, there is typically only one officer in the housing control room and, at most, one officer moving through the housing zones with nearly two hundred (200) detainees.

### 214.

By Defendant Labat not providing for the continuous presence of detention officers on 7-South, there is a causal connection between Defendant Labat's actions as the supervising official at the Fulton County Jail and the violation of Dayvion Blake's constitutional right to be protected as a detainee.

### 215.

Defendant Labat's failure to act constitute deliberate indifference to Dayvion Blake's safety and well-being, resulting in serious harm – Dayvion Blake's death.

### 216.

By not providing for the discovery and confiscation of shanks, and failing to provide secure cell doors and keep door locks in good repair, Defendant Labat personally participated in the violation of Dayvion Blake's constitutional rights.

### 217.

For the foregoing reasons, the Estate of Dayvion Blake and the children of

Dayvion Blake are entitled to recover compensatory damages, punitive damages, and all other damages allowed under law from the detention officers.

**COUNT IV:**
**ATTORNEY'S FEES**

218.

Plaintiffs seek attorneys' fees against all Defendants under O.C.G.A. § 13-6-11 as Defendants have acted in bad faith, been stubbornly litigious, and caused the plaintiffs unnecessary trouble and expense.

219.

**WHEREFORE**, Plaintiffs pray that they have a trial on all issues and judgment against Defendants as follows:

(a)    That Plaintiffs recover the full value of the life of the decedent;

(b)    That Plaintiffs recover for the decedent's pre-death mental and physical pain and suffering, funeral expenses and medical expenses;

(c)    Award punitive damages against each Defendant who has been sued in their individual and corporate capacity;

(d)    Award reasonable attorney's fees, expenses, and costs of litigation;

(e)    That Plaintiffs recover such other and further relief as is just and proper;

(f)    That all issues be tried before a jury.

This 11th day of December, 2024.

[signatures on following page]

49

Respectfully Submitted,

/s/ Michael D. Harper
MICHAEL D. HARPER
Georgia Bar No. 328378
Patrick W. Leed
Georgia Bar No. 454862
Attorneys for Plaintiff

Michael D. Harper, P.C.
3017 Bolling Way, N.E., Suite 150
Atlanta, Georgia 30305
Telephone: (404) 271-6618
Facsimile: (404) 600-2146
Email: Mharper@mharperlaw.com
PLeed@mharperlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been

prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point

typeface.

This 11th day of December, 2024.

Respectfully Submitted,

/s/ Michael D. Harper
MICHAEL D. HARPER
Georgia Bar No. 328378
PATRICK W. LEED
Georgia Bar No. 454862

Michael D. Harper, P.C.
3017 Bolling Way, N.E., Suite 150
Atlanta, Georgia 30305
Telephone: (404) 271-6618
Facsimile: (404) 600-2146
Email: Mharper@mharperlaw.com
PLeed@mharperlaw.com